IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

IN RE: OWENS CORING, *et al.*

| | | |
|---|---|---|
| OWENS CORNING, *et al.* | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action 07-714(JJF) |
| | ) | |
| v. | ) | |
| | ) | |
| YVONNE COX, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | Bankruptcy Case No. 00-3837 |

**MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION OF DEFENDANT YVONNE COX
FOR TRANSFER OF VENUE TO THE UNITED STATES
DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN**

SULLIVAN·HAZELTINE·ALLINSON LLC

William D. Sullivan (Del ID No. 2820)
William A. Hazeltine (Del ID No. 3294)
4 East 8th Street, Suite 400
Wilmington, DE  19801
Tel: (302) 428-8191
Fax: (302) 428-8195

*Attorneys for Defendant Yvonne Cox*

Dated:  January 18, 2008

## NATURE AND STAGE OF THE PROCEEDINGS

On October 5, 2000, the Plaintiffs filed their respective voluntary petitions for relief under chapter 11 of tile 11 of the United States Code, 11 U.S.C. §§ 101-1330 (as amended, the "Bankruptcy Code") in the United States District Court for the District of Delaware (the "Bankruptcy Court").

On or about June 14, 2001, Defendant Yvonne Cox filed a claim in the Plaintiffs' bankruptcy cases in the amount of $850,000 and subsequently, on or about February 3, 2006, Ms. Cox filed an amendment to her claim in the amount of $1,141,900 (the "Claim," attached as Exhibit A).

On or about September 26, 2007, the Bankruptcy Court entered an order confirming the Sixth Amended Joint Plan of Reorganization of Owns Corning and Its Affiliated Debtors and Debtors in Possession (as Modified) dated as of July 10, 2006.

On or about April 27, 2007, the Plaintiffs objected to the Claim and requested that the Bankruptcy court disallow and expunge the Claim pursuant to section 502(b) of the Bankruptcy Code (the "Objection"). On or about June 8, 2007, Ms. Cox filed a response to the Objection.

On October 31, 2007, the Bankruptcy Court entered its Order Determining Non-Core Status Pursuant to Local Rule-5011-1. Pursuant to the order, the Bankruptcy Court ruled that the proceedings with respect to the Claim are "non-core" proceedings within the meaning of 28 U.S.C. §157. On November 19, 2007, United States District Court Judge Fullam entered an order withdrawing the reference of the proceedings related to the Claim from the Bankruptcy Court, which order was not docketed. On January 7, 2008, Judge Fullam entered a subsequent order withdrawing the reference of proceedings related to the Claim from the Bankruptcy Court (Docket No. 4).

1

## STATEMENT OF FACTS

The Claim is a personal injury claim arising from injuries sustained by Ms. Cox on June 16, 1999 at a manufacturing facility located in or about Grand Rapids, Michigan. At the time of the accident, the facility was owned by Falcon Foam Corporation, a subsidiary of plaintiff Owens Corning and a debtor in the Plaintiffs' bankruptcy cases.

Ms. Cox is a resident of Michigan. Ms. Cox has retained an attorney in Michigan to represent her with respect to the Claim. [See attachments to Claim, Exhibit A].

Ms. Cox physical condition makes travel difficult, as detailed in the report attached to her proof of claim. In addition, it will be financially burdensome for her to pay for her and her counsel to travel to Delaware, and inconvenient for any witness, all of whom resided in Michigan at the time the claim arose.

Owens Corning, the Plaintiff in the caption of this matter (but the defendant with respect to Ms. Cox's tort claim) is headquartered in Toledo, Ohio, just south of Michigan.

## DISCUSSION

A district court may transfer venue of a proceeding to another judicial district where the proceeding could have been brought "[f]or the convenience of the parties and witnesses, in the interest of justice . . . ." 28 U.S.C. § 1404. In deciding a motion to transfer venue, courts "consider all relevant factors to determine whether on balance the litigation would more conveniently proceed and the interests of justice be better served by a transfer to a different forum." *Jumara v. State Farm Inx., Co.*, 55 F.3d 873, 879 (3r$^d$ Cir. 1995). In making this determination, courts consider several public and private factors including the following:

- Whether the claim arose elsewhere;

- The convenience of the parties as indicated by their relative physical and financial conditions

2

- The convenience of the witnesses if the witnesses will be unavailable for trial in one fora;

- The location of books and records;

- Practical considerations that could make the trial easy, expeditious or inexpensive;

- The local interest in deciding local controversies at home; and

- The familiarity of the judge with applicable state law.

*Id.*, 879-80.

These factors weight in favor of transferring the captioned matter to the United States District Court for the Western District of Michigan.

First, the fact that Ms. Cox's claim arose in Michigan strongly weighs in favor of a transfer.

Second, it would be financially burdensome and time consuming for Ms. Cox to attend trial in Delaware. Moreover, Ms. Cox's physical condition would make it difficult for her to travel to Delaware. In contrast, because the Plaintiffs are large corporations with no significant physical contacts to Delaware, the incremental increase in the burden on the Plaintiffs would be insignificant at most. Moreover, the Plaintiffs' corporate headquarters in Toledo, Ohio, are much more convenient to Michigan than to Delaware.

Third, counsel believes that substantially all witnesses necessary for trial in this matter are located in Michigan and would likely be beyond this Court's subpoena power.

Fourth, counsel believes that all books and records necessary for trial in this matter are located in Michigan.

Fifth, trial could be completed more efficiently and less expensively in Michigan. If the matter is transferred, Ms. Cox could utilize Michigan counsel previously retained who is familiar

with the legal issues raised and the treating physicians who might be called to testify. Moreover, since all the witness and documents are located in Michigan, discovery could be completed more efficiently and at less cost in Michigan.

Sixth, and of significant importance, a Michigan court would have a stronger local interest in the outcome of this matter since the action arose in Michigan and the matter raises issues of Michigan law and public policy.

Lastly, given that Michigan law applies, it is likely that a district court judge in Michigan would have more familiarity with the legal issues raised in this matter.

## CONCLUSION

WHEREFORE, for the foregoing reasons, the Defendant requests that this Honorable Court enter an order transferring this case to the United States District Court for the Western District of Michigan and granting such other and further relief as is just and proper.

Dated: January 18, 2008
Wilmington, Delaware

SULLIVAN·HAZELTINE·ALLINSON LLC

William D. Sullivan (Del ID No. 2820)
William A. Hazeltine (Del ID No. 3294)
4 East 8th Street, Suite 400
Wilmington, DE  19801
Tel: (302) 428-8191
Fax: (302) 428-8195

*Attorneys for Defendant Yvonne Cox*

# EXHIBIT A

FORM B10 (Official Form 10) (10/05)

| UNITED STATES BANKRUPTCY COURT | DISTRICT OF  DELAWARE | PROOF OF CLAIM |
|---|---|---|

| Name of Debtor | Case No. |
|---|---|
| FALCON FOAM CORPORATION | 00-3837 (JFK) |

| Names of Creditor (The person or other entity to whom the debtor owes money or property): **YVONNE COX** | ☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars. | **FILED** |
|---|---|---|
| Names and address where notices should be sent: **YVONNE COX c/o JOHN T. PIGGINS PO BOX 306 Grand Rapids, MI 49501-0306** Telephone number: 616-831-1793 | ☐ Check box if you have never received any notices from the bankruptcy court in this case. ☐ Check box if the address differs from the address on the envelope sent to you by the court. | FEB 03 2006  *(illegible court stamp)*  THIS SPACE IS FOR COURT USE ONLY |

| Last four digits of account or other number by which creditor identifies debtor: **Claim amends claim 0002853, filed 6/14/01** | Check here if this claim ☐ replaces ☒ amends | a previously filed claim, dated 06/11/01 |
|---|---|---|

**1. Basis for claim**
- ☐ Goods Sold
- ☐ Services performed
- ☐ Money Loaned
- ☒ Personal Injury/wrongful death
- ☐ Taxes
- ☐ Other

- ☐ Retiree benefits as defined in 11 U.S.C. §1114(a)
- ☐ Wages, salaries, and compensation (fill out below)
  Last four digits of your SS#: XXX-XX-____
  Unpaid compensation for Services Performed
  from ____ to ____
      (date)      (date)

**2. Date debt was incurred  6/16/99  (See Attached)**

**3. If court judgment, date obtained:**

**4. Classification of Claim.** Check the appropriate box or boxes that best describe your claim and state the amount of the claim at the time case filed.
See reverse side for important explanations.

Unsecured Nonpriority Claim    $ 1,141,900

☐ Check this box if:  a) there is no collateral or lien securing your claim, or b) your claim exceeds the value of the property securing it, or c) none or only part of your claim is entitled to priority.

Unsecured Priority Claim

☐ Check this box if you have an unsecured priority claim, all or part of which is entitled to priority.

Amount entitled to priority $ ____

*Specify the priority of the claim:*
- ☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B)
- ☐ Wages, salaries, or commissions (up to $10,000),* earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. § 507(a)(4).
- ☐ Contributions to an employee benefit plan – 11 U.S.C. § 507(a)(5).

**Secured Claim**

☐ Check this box if your claim is secured by collateral (including a right of setoff).

Brief Description of Collateral:
☐ Real Estate  ☐ Motor Vehicle  ☐ Other ____

Value of Collateral:  $ ____

Amount of arrearages and other charges at time case filed
Included in secured claim, if any: $ ____

- ☐ Up to $2,225* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. § 507(a)(7).
- ☐ Taxes or penalties owed to governmental units – 11 U.S.C. § 507(a)(8).
- ☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(___).

*Amounts are subject to adjustment on 4/1/07 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

| 5.  Total Amount of Claim at Time Case Filed: | $ 1,141,900 | $ | $ | $ 1,141,900 |
|---|---|---|---|---|
| | (unsecured) | (secured) | (priority) | (total) |

☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

| 6.  **Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim. | THIS SPACE IS FOR COURT USE ONLY |
|---|---|

**7.  Supporting Documents:** *Attach copies of supporting documents,* such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.

**8.  Date-Stamped Copy:** To receive a date-stamped copy of your claim, enclose a stamped, self-addressed envelope and an additional copy of this proof of claim.

| Date | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any): | |
|---|---|---|
| 1/27/06 | *(signature)* —  John T. Piggins, Attorney for Yvonne Cox | 2853 |

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 11 U.S.C. §§ 152 and 3571.

## R. KEVIN THIEME, P.C.

ATTORNEY AT LAW
560 GRAND PLAZA PLACE
220 LYON STREET, N.W.
GRAND RAPIDS, MICHIGAN 49503-2210

R. KEVIN THIEME

TELEPHONE: (616) 451-85
FACSIMILE: (616) 451-85(

January 17, 2006

Ms. Yvonne R. Rado, CLA
Owens Corning
One Owens Corning Parkway
Toledo OH 43695

RE:  OWENS CORNING, ET AL       CASE NO 00-03837 (JKF)
     PROOF OF CLAIM NO:          2853
     DATE OF LOSS:               6/16/99
     MY CLIENT:                  YVONNE COX

Dear Ms. Rado:

On December 2, 2005, attorney Adam Isenberg of the Saul Ewing Law Firm requested attorney John Piggins to provide you with a "written settlement demand" regarding Yvonne Cox's claim against Falcon Foam Corporation.   Mr. Piggins relayed the request to me.

You received a November 6, 2000, settlement letter, photographs and medical records documenting Yvonne Cox's severe leg injuries and resulting depression. Enclosed with that letter was an ominous narrative report from Yvonne's treating physician Dr. Jones which reviewed her multiple surgeries and added:

    ✓    Her badly comminuted fractures "went into the ankle joint" among other places

    ✓    Her pilon fracture has "the lowest musculoskeletal functional outcome analysis score"

    ✓    Her pilon fractures are a "very difficult entity to treat and recover from"

    ✓    She _will_ have residual problems including "swelling, pain, deconditioning to the leg, decreased motions and problems with stairs and uneven surfaces and performing activities . . ."

    ✓    Regarding work, Dr. Jones stated "high impact or heavy lifting-type activities" will hasten cartilage destruction resulting in arthritis and a possible ankle fusion.

## EXHIBIT A

Ms. Yvonne R. Rado
January 17, 2006
Page 2

At the time of the November 6, 2000, letter the settlement demand was $500,000.00.
Unfortunately, due to worsening medical issues (which will be detailed later with the
accompanying medical records) a Proof of Claim was submitted on June 14, 2001, indicating the
"total amount of the claim at the time the case filed" was $850,000.00. Since June 14, 2001,
Yvonne's medical prognosis continued on a downward spiral as documented below which has
created a higher case value.

The following is an update of Yvonne Cox's medical treatment since the July 24, 2000, narrative
report.

## I.    FOLLOW UP OF PILON FRACTURE, SECOND AND THIRD METATARSAL FRACTURES

As recorded in Dr. Jones' 8/25/00 note, Yvonne was up to 4 hours of work a day (14 months
after the accident). To do this, she needed the banned drug Celebrex. Examination revealed
limited dorsal flexion, plantar flexion, "decreased sensation," "ostopenia from disuse" and "limp
disorder." She was told to return in April 2001.

Telephone messages document pain: "Celebrex not helping her" (11/7/00), "Vioxx prescribed"
(1/30/01), Vioxx reorder (2/27/01).

The 4/9/01 visit with Dr. Jones documented more problems in her ankle and lateral foot. The
pain was "markedly interfering with her life." X-ray data revealed "the possibility of a spur"
which necessitated a bone scan/CT scan for possible surgery to excise the osteophyte and
evaluate fusion surgery.

CT/bone scan results were reviewed at Yvonne's 4/30/01 visit. The CT revealed "degenerative
changes" for the cuboid. Dr. Jones opined Yvonne has:

> "Post-traumatic degenerative changes noted at her calcaneal cuboid
> and 4th and 5th TMT joint area."

> "In my opinion she would most likely benefit from a fusion of this area to
> relieve her pain . . ."

Dr. Jones requested a consultation with Dr. John Anderson.  On 5/2/01, Dr. Anderson reviewed
the bone scan which "lit up" in the calcaneal cuboid joint. He injected the joint and
recommended a "fusion of the calcaneal cuboid joint" if the injection relieved pain.

With a nasty, permanent fusion eminent, the $500,000.00 initial settlement demand was raised to

Ms. Yvonne R. Rado
January 17, 2006
Page 3

the $850,000.00   May 22, 2001, Proof of Claim figure.

Yvonne returned to Dr. Anderson on 5/25/01 indicating he wanted to "fuse this joint" but offered
no guarantee in pain reduction ("she may still have some residual pain coming from the 4th and
5th metatarsal joints").   A nasty list of potential risks and complications were reviewed with
Yvonne; she readily accepted the risks without anything guaranteeing a break from her relentless
pain.

Surgery was performed on 6/14/01 with a diagnosis of "post-traumatic right calcaneocuboid
arthrosis."   The surgery report is instructive as it outlines the possibility of another potential
surgery following the current fusion.   The surgical report details a sick ankle joint with large
osteophytes which were "mulched up" to be used as bone grafts.   Low lights include:

- ✓   "The joint was very arthritic"
- ✓   "There were areas of exposed bone and kissing osteophytes"
- ✓   Numerous screws and plates were needed.

The Grand Valley Surgical Center records are attached as Exhibit 1.

Surgical follow up occurred on 6/28/01, 8/3/01 (cast off, pneumatic walker prescribed), 9/7/01
(walking with the boot . . . significant relief of pain), with multiple telephone messages
requesting pain medication.

On 12/5/01, Dr. Anderson notes "Yvonne took a turn for the worse."   He injected her painful
sites and put her back the pneumatic boot.   Other appointments indicated the following:   "A lot
of pain (1/30/02), "inconclusive evidence for solid fusion (4/24/02).   On 7/24/02, Dr. Anderson
noted she still had pain and swelling at the fusion site.   X-rays were taken and Dr. Anderson
opined:

> "I think she has developed a painful nonunion of the
> calcaneocuboid joint . . . We talked about revision fusion with
> bone grafting and hardware removal."

On 9/19/02, Yvonne had her fifth surgery.   Procedures included "right foot hardware removal,
revision calcaneocuboid fusion, proximal tibial bone graft. "   During surgery a "fibrous
nonunion" was confirmed prompting Dr. Anderson to cut out the fibrous tissue, cut into another
section of Yvonne's leg to pull out bone and place the new bone around the calcaneocuboid
fusion site.   More screws were used.   More plates were used.   The operative report is attached as
Exhibit 2.

Ms. Yvonne R. Rado
January 17, 2006
Page 4

Additional office visits occurred on 2/12/03 ("still has some discomfort"), 5/7/03 (pain in lateral forefoot, positive Mulder click, possible Morton's neuroma, **injection given**), 6/18/03 (discussed options of neurectomy and neurolysis), 8/7/03 (Morton's neuroma, neruolysis surgery cancelled . . . request pain medications), 10/15/03 Dr. Anderson opines:

> "I think is it quite reasonable to proceed with a neurolysis.  She is aware·that there is <u>no guarantee we are ever going to make her foot pain free given the chronic pain she has had and the significant crush injury she sustained.</u> "

On November 4, 2003, Yvonne underwent her **sixth surgery** to address her right foot third interspace neuroma.

On January 2, 2004, her pain had improved but there was still "migratory pains around her foot and ankle." Unfortunately, Dr Anderson opined "I do not think there really much we can do from this point forward:

> **"I told her·I think her foot is as good as it is going to get."**

She obtained a return to work release.

Dr. Anderson's 3/17/2004, office notes sets forth his permanent restrictions for Yvonne:

> " . . . . I am going to place her on restrictions of being on her feet no more than 20 hours per week."

By July 29, 2005, Yvonne was back in Dr. Anderson's office "taking care of her three children by herself."  Her lateral pain problems were attributed to retained hardware so Yvonne scheduled her seventh surgery for August 16, 2005.  The surgical notes are attached as Exhibit 3.

She continues to treat for her chronic pain.

The Orthopaedic Associates of Grand Rapids' records are attached as Exhibit 4.

## II.    AGGRAVATION OF PRE-EXISTING CONTROLLED DEPRESSION

Documents attached to my initial demand letter indicated Yvonne was on antidepressant medications for the past seven years "without significant problems."  The initial set of records I sent you tied an outbreak of anxiety, depression and nightmares to the accident.  Unfortunately,

Ms. Yvonne R. Rado
January 17, 2006
Page 5

the problems continued after the last counseling note you received (4/19/00).

Records document calls/visits on 4/27/00, 5/4/00, 5/16/00 ("Depression and anxiety due to (1) inability to return to work since surgery which confines client to home and parenting . . ." and other issues), 7/12/00 (depressive symptoms heightened after spouses lack of support during medical crisis), 7/19/00, 8/3/00, 8/7/00 ("depressed and suicidal last week . . . reports depression . . . due to ongoing pain/foot problems/swelling")("Worker's comp is suggesting that she gets a new vocation due to this disability"), 9/6/00 , 10/18/00, 12/7/00, 3/14/01, 4/16/01, 5/9/01, 5/21/01, 6/27/01, 7/11/01, 7/12/01, 7/26/01, 12/16/01, 3/21/02, 6/6/02, 9/12/02, 1/9/03, 1/23/03, 1/30/03, 3/6/03, 4/3/03, 6/11/03, 10/1/03, 11/13/03, 2/6/04, 11/5/04, 4/26/05, and 11/21/05.

Although the vast psychological records are chalk full of personal issues (divorce, abuse, etc.), the added stress of chronic pain, questionable employability with a significant injury and depression as a result of the injury are woven throughout the records.

The Grand Valley Health Plan counseling records are attached as Exhibit 5.

III.   SUMMARY

Yvonne is almost six years post accident. She has endured seven surgeries, numerous injections, more physician visits that most people have in a lifetime and countless pain medications.   More surgeries are in her future.  I have requested an updated medical/wage loss comp lien and received a verbal response:  $32,763.84 (medical),  $9,136.29 (wages).

This physically healthy lady was just 41 years old when her severe injuries occurred.    With a life expectancy of 85, a value of just $25,000.00 for pain/suffering/loss of enjoyment of life results in a claim of $1.1 million without medical or wage loss.

If you need any further information, please do not hesitate to contact me.

Very truly yours,

R. Kevin Thieme

RKTmrd

cc:    John Piggins, Esq.

## R. KEVIN THIEME, P.C.

ATTORNEY AT LAW
560 GRAND PLAZA PLACE
220 LYON STREET, N.W.
GRAND RAPIDS, MICHIGAN 49503-2210

R. KEVIN THIEME

TELEPHONE: (616) 451-8591

FACSIMILE: (616) 451-8562

November 6, 2000

Ms. Yvonne R. Rado, CLA
Owens·Corning
One Owens Corning Parkway
Toledo OH 43695

Dear Ms. Rado:

Enclosed please find all the information necessary for your evaluation of Yvonne Cox's claim against Falcon Manufacturing (owned by Owens Corning).

### BACKGROUND INFORMATION

Yvonne Cox, D.O.B. 7/16/57, S.S. # 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 is married to Doug Cox. They have three children under the age of 18 (Desires -7, Dakota - 5, and Dillon -4).

At the time of Yvonne's June 16, 1999, accident, she was employed by Commercial Cleaning Company. She had been employed by Commercial Cleaning Company since March 1999, working approximately 22 hours a week at $7.60 an hour. The job consisted of cleaning offices, bathrooms and break rooms. Yvonne, and another Commercial Cleaning Company employee, Christine Vining, were assigned to work at your insured's plant, Falcon Manufacturing.

### LIABILITY

On June 16, 1999, Yvonne and Christine had been at Falcon for approximately 1/2 hour before running out of supplies. After obtaining additional supplies in the back room, Yvonne, with Christine behind her, began walking to the front of the plant carefully staying within the safety path defined on each side by a yellow line.

Ahead of Yvonne and Christine was a man with a black T-shirt covered with tattoos (Keith). He had been pushing one of the large (approximately 15' - 20' tall) styrofoam blocks on a cart. Yvonne watched him push it up to a machine which was located fairly close to the safety line. As Yvonne approached, she established visual contact with the man and asked to go by. The man looked right at Yvonne and nodded so Yvonne began passing the styrofoam tower on the left side. She was completely within the safety path.

## EXHIBIT B

Ms. Yvonne R. Rado
November 6, 2000
Page 2

Despite seeing Yvonne go behind the styrofoam tower, the tattooed man kicked the tower over pinning and crushing Yvonne's leg.

The apologetic worker stated "Oh my God, what did I do?" The block was lifted off Yvonne's leg and swelling began immediately.

This is the proverbial clear liability situation, a Falcon Foam employee kicked over a deadly, heavy styrofoam block into a safe travel area without knowing whether Yvonne had successfully walked passed the block. If "Keith" claims he never saw Yvonne, he is negligent for kicking the block over in a safety zone without checking for people.

The partial Falcon Manufacturing incident report gives little to no useful information although it does note "Keith" apparently saw the "cleaning people." It does not appear that any OSHA report was filed. See **Exhibit 1**.

There are no liability issues.

INJURIES

The plant shift supervisor (Randy Eggars) was contacted right after the accident.

Claiming to be a paramedic, Randy arrived and had Christine wiggle her toes before packing her leg with ice and splinting it. Yvonne's coworker, Christie, contacted Yvonne's husband, Doug. Incredibly, no one called an ambulance for Yvonne but, using a make-shift styrofoam gurney, employees wheeled Yvonne out of the factory.

When Yvonne's husband arrived, the makeshift Falcon paramedic crew loaded her (and the styrofoam gurney) into Doug's truck. Doug immediately headed Spectrum Hospital.

As anyone with a broken bone would know, the ride to Spectrum Health was disastrous. Every small normally unnoticeable bump in the road magnified the pain ten-fold as the internally broken bones damaged soft tissues. On route, she threw up because of intense pain. At Spectrum, Yvonne was evaluated by emergency room physicians who noted "severe pain" and an "edematous" ankle. She was wheeled to x-ray.

Early x-rays showed a (1) "comminuted fracture of the distal diametaphysis of the tibia with both "transverse and longitudinal components." (2) The longitudinal components showed evidence of "extension into the articulating surface of the distal tibia." (3) There was "slight impaction of the "diametaphyseal component" and (4) a "transverse fracture of the distal mid dyaphysis of the fibula with lateral displacement of the distal components." Yvonne was wheeled back to the

Ms. Yvonne R. Rado
November 6, 2000
Page 3

emergency room for her first surgery, a closed reduction and long casting.  Subsequent x-rays of
the right foot showed more damage including the following:

    1.    A fracture of the proximal phalanx of the great toe.

    2.    Fractures of the 1st, 2nd, and 3rd metatarsals shafts.

She was admitted to the hospital for 24 hour observation before deciding on future surgeries.

As indicated in the progress records, a June 17, 1999, orthopaedic consultation (with trauma
surgeon Dr. Jones) was requested.  Dr. Jones does an excellent job of diagraming Yvonne's
painful multiple fractures.  He drew an excellent picture showing the need for Yvonne's second
operation, an open reduction and internal fixation.  The diagram drawn by Dr. Jones' is
reproduced below:



Ms. Yvonne R. Rado
November 6, 2000
Page 4

On June 17, 1999, Yvonne was brought to surgery with a preoperative diagnosis of :

-Right pillion fracture AO type C2

-1st, 2nd, 3rd, 4th, and 5th metatarsal neck fractures

Dr. Jones proposed to perform the following procedure:

"Open reduction and internal fixation of right pillion fracture with
anterolateral approach and modified cloverleaf, and plating of fibula,
9-hole cloverleaf and 6-hole 1/3 tubular plate, double stacked."

In the operating room, the first of three incisions was cut into Yvonne's leg (the postlateral
incision). Upon reaching the fibula, Dr. Jones noted a large "butterfly" fragment which ripped
through the fascia. He plated the fibula with six screws.

Next, he cut into Yvonne's leg using an anterolateral approach and addressed the distal tibia
attempting to align the distal fragments. A third incision was made to allow placement of a 9-
hole cloverleaf plate and numerous screws were fixed into the bone. All incisions were closed
and Yvonne was wheeled back to her room with post-operative plans consisting of "non-
weightbearing for three months" and "continuous epidural for two days post-operatively for pain
management . . ."

Despite continuous pain medication, Yvonne, on June 18, 1999, rated her pain as "10 out of 10."
More pain medications were given. Later in the day she rated her pain as 7-8 out of 10 before it
returned to the "10 out of 10" level. Three additional June 18, 1999, chart notes all document her
condition as "Very painful."

Physical therapy records also documents Yvonne's pain on 6/18/99 ("Patient tolerance poor
secondary to nausea and pain")("Patient attempted standing for approximately 30 seconds and
had to sit down, then lie down secondary to nausea.")

On June 19, 1999, physicians attempted to wean Yvonne of her epidural but "patient did not
tolerate epidural weaning." After a five inpatient stay, Yvonne was discharged on June 21, 1999.

X-rays of the nasty fractures are attached as Exhibit 2.

The Spectrum Health records are attached as Exhibit 3.

After her discharge from Spectrum Health, Yvonne followed up with Dr. Jones on July 2, 1999,

Ms. Yvonne R. Rado
November 6, 2000
Page 5

where she was put in a "pneumatic fracture brace" and deemed nonweightbearing.

At her July 30, 1999 visit, swelling was still present but had "markedly diminished." She remained nonweightbearing.  At her next appointment, September 10, 1999, Dr. Jones noted "Yvonne can begin weightbearing as tolerated." While attempting to weightbear she "slipped and twisted her right ankle" prompting a September 30, 1999, office note which indicated all was "intact."

During her October 25, 1999 office visit, Yvonne complained of "discomfort" and "weakness" in the leg with "some electrical shocks distally" which Dr. Jones felt was "consistent with either a neurapraxia or scar entrapment of her superficial peroneal nerve." Dr. Jones prescribed Celebrex and more physical therapy.

Yvonne started physical therapy on September 10, 1999, after evaluation by Scott DeVries who noted her pain was at "7/10 while resting" which was high.  During his exam, he noted "hypersensitivity in the lower leg." Yvonne had "tenderness" at all her scars with "extreme hypersensitivity" to the toes and anterior tibial area.  Therapist DeVries noted that Yvonne "has no metatarsal flexion at this point.  The joint feels fused."

Further physical therapy appointments occurred on 9/23/99, 9/17/99 ("frustrated, hoping that she would do much better."), 9/30/99 ("Did slip with her crutches and fall," with "significant increase in swelling and pain") 10/4/99 ("antalgic gait pattern"), 10/7/99 ("Frustrated with the amount of pain"), 10/11/99 ("In moderate pain."), 10/19/99 ("continues to be in quite a bit of pain and it is making her sick"), 10/21/99, 10/25/99 ("very painful today"), 11/1/99, 1/18/99, 11/23/99 ("admittedly more depressed." "having increased pain in her foot and notices that the plate area is rubbing on her shoes.") See Exhibit 4.

She was back to see Dr. Jones on December 10, 1999, six months after her fracture date.  She complained about her "strength and balance" with Dr. Jones noting "slight tenderness" at the plate.  There was "decreased sensation" from her superficial peroneal nerve and the hardware "was prominent."  A discussion was held about removing some of the hardware to cure her pain.

Yvonne attempted work on January 4, 2000, at 25 hours a week.  It was painful.  It produced swelling.  On January 31, 2000, Dr. Jones noted complaints of "overall ankle and foot pain with swelling." Ominously, Dr. Jones noted Yvonne did "sustain a pilon injury which is very difficult in terms of rehabilitation." Hardware removal was again discussed.

On March 27, 2000, Dr. Jones had a "preop discussion with the patient" concerning Yvonne's "dorsal foot swelling, numbness, tingling and irritation." Mild swelling was noted with the prominent appearance of her hardware plate.  Despite the risks inherent in plate removal (further

Ms. Yvonne R. Rado
November 6, 2000
Page 6

superficial peroneal nerve injuries and additional scarring), Yvonne requested a third surgery to eliminate some of her pain.

On April 11, 2000, Yvonne traveled to the Grand Valley Surgical Center for her third surgery. Her healed incisions were cut open and four screws removed from one plate. Another incision was made to attack the plate from a different route allowing Dr. Jones to remove five more screws. During surgery he saw the "beginning of an inflamed area of tissue" which he cut out. After an hour in surgery, Yvonne was sent home. The Grand Valley Surgical Center records are attached as **Exhibit 5.**

Pictures taken after her April surgery are attached as **Exhibit 6.**

She returned to see Dr. Jones on May 26, 2000, noting "some pain when being up on her feet for an extended period of time." Dr. Jones saw "some scar retraction" and "decreased light touch sensation." He released her to work on June 10, 2000, at 2-4 hours a day to increase over a six week span.

Dr. Jones wrote Yvonne's employer a note dated June 9, 2000, indicating Yvonne's "prognosis at this time is not fully defined." She needs an additional 18 months rehabilitation from her plate removal surgery before a maximum improvement will be seen. Ominously, he notes "She will most likely always have some component of a post-traumatic permanent partial residual from this injury."

I requested a detailed narrative from Dr. Jones and received, in response, his July 24, 2000, letter. In that letter he stated Yvonne's fracture "went into the ankle joint" among other places. Unfortunately, Dr. Jones documents "Pilon fractures consistently have the lowest musculoskeletal functional outcome analysis scores." He feels they are "a very difficult entity to treat and recover from."

Regarding the long term outlook, he states "She still will have some residual problems" consisting of "swelling, pain, deconditioning to the leg, decreased motions, and problems with stairs and uneven surfaces and performing activities . . ."

Finally, Dr. Jones notes that "High-impact or heavy-lifting type activities" will hasten the destruction of cartilage creating "stress points" to the joint surface. This results in arthritis and will cause pain in the future. To fix this problem, the option would be to "fuse her ankle joint": a procedures that only lasts for 10-15 years." According to Dr. Jones, Yvonne may require a number of those procedures if her ankle deteriorates. Dr. Jones's office notes and narrative report are attached as **Exhibit 7.**

Ms. Yvonne R. Rado
November 6, 2000
Page 7

Yvonne's most recent visit to Dr. Jones occurred on August 25, 2000. Dr. Jones noted Yvonne walks with a "limp disorder" and, even with daily pain medication, Yvonne still has "stiffness and pain." Her next appointment is April 2001.

Concurrent with her orthopaedic injuries, Yvonne struggles with significant, severe depression as a result of this accident. Yvonne has a past history of depression making her extremely susceptible to an aggravation of her condition.

On October 14, 1999, she began counseling with Pam Witte, ACSW, for "grief and depression symptoms as a result of a work place accident." Her medical history includes being "on and off" antidepressants for the last seven years but without any significant problems. A review of the phone calls and client sessions beginning October 4, 1999, indicates the accident has caused "nightmares, depression, crying, physical pain, problems coping with disability and homebound status." According to Ms. Witte, Yvonne's depression revolved around her inability to do the "activities of daily living, parenting responsibilities, financial stress, marital stress, chronic pain and post-traumatic stress symptoms." Pertinent visits include a need for increase in antidepressant medications (11/4/99), reports of "depression and fatigue" (11/17/99), increased medications (12/23/99), experiencing "pain, fatigue and slowness" during job (1/10/00), "ongoing depression" (2/7/00), "significant swelling /pain with foot." (3/27/00), grief/depression due to foot surgery (4/19/00), etc. The records are attached as **Exhibit 8**.

As of September 28, 2000, there is a worker's compensation lien of $19,428.05 for medical bills ($15,582.40), and wage loss ($3,845.65). Attached as **Exhibit 9** are the payout logs.

Current scar photographs are attached as **Exhibit 10**.

## DAMAGES

As a result of the Falcon Foam employee's negligence, Yvonne Cox, age 43, will suffer with the following injuries for the next 35 years according to the statutory mortality tables:

>     -Comminuted fracture of the tibia with extension into the articulating surface
>      of the tibia

>     -Impaction of the diametaphysis component of the tibia

>     -Transverse fracture of the distal fibula with lateral displacement

>     -Fracture of the great toe

Ms. Yvonne R. Rado
November 6, 2000
Page 8

-Fracture of the 1st, 2nd and 3rd metatarsal shafts.

-Right pilon fracture

-1st, 2nd, 3rd, 4th and 5th metatarsal neck fractures

-Surgery:  Closed reduction

-Surgery: Open reduction and internal fixation with countless plates,
          screws and pins

-Surgery: Hardware removal

-Neurapraxia or scar entrapment of her superficial peroneal nerve

-Extreme hypersensitivity to her toes, lower leg and anterior tibial
 area

-Numerous painful physical therapy sessions to break adhesions so severe
 that the physical therapist opined her joint felt "fused."

-Dorsal foot swelling, numbness, tingling and irritation.

As a result of her injuries, orthopaedic specialists have noted the following:

-- Her injury has "the lowest musculoskeletal functional outcome analysis
   scores"

-Her injuries are a "very difficult entity to treat and recover from"

-Her injuries "most likely always have some component of a post-
 traumatic permanent partial residual"

-Her injuries will result in "decreased motions, and problems with
 stairs and uneven surfaces and performing activities"

-Her injuries may "require a number of ankle fusions"

This relatively young lady with a 30 year life expectancy can expect her already painful condition
will grow worse with use and age.  Unfortunately, she is caught in the classic dilemma: She must

Ms. Yvonne R. Rado
November 6, 2000
Page 9

work to support her family but working hastens a predictably painful downhill prognosis.

Since her foot is painful every minute of every hour of everyday, especially toward the later part of the day, one can certainly evaluate this case by estimating the value a jury would place on being pain-free for a 6-8 hour day . At just $25.00 a day ($3.12 an hour), Yvonne's noneconomic damage equate to approximately $320,000.00. . To date, she has $20,000.00 worth of medical/wage loss damages with further physician appointments scheduled. One or two fusion surgeries would increase the medical bills four fold.

With her significant injuries, Yvonne faces the reality off future work loss as her arthritis becomes more dehabilitating.

A reasonable settlement figure for this case would be $500,000.00.

Please advise if you need additional information.

Very truly yours,


R. Kevin Thieme

RKTmrd

Encs.

cc:     Ms. Patricia Lynch (w/o enclosures)

John T. Piggins
Attorney at Law

616.831.1793
616.988.1793 fax
pigginsj@millerjohnson.com



# MILLER
# JOHNSON

Attorneys and Counselors

Calder Plaza Building
250 Monroe Avenue NW, Suite 800
P.O. Box 306
Grand Rapids, MI 49501-0306
616.831.1700
616.831.1701 fax

Kalamazoo, Michigan 269.226.2950

www.millerjohnson.com

☰ MERITAS LAW FIRMS WORLDWIDE

January 30, 2006

In re: Owens Corning, *et al.*
c/o Robert L. Berger & Associates LLC
Claims Agent
16501 Ventura Blvd., Suite 440
Encino, CA 91436-2068

Re:    Falcon Foam Corporation, Chapter 11 Case No. 00-3840

Dear Mr. Berger:

Enclosed please find an original and two copies of an Amended Proof of Claim our office is filing on behalf of creditor Yvonne Cox in the above-captioned matter. This claim amends Claim No. 0002853, which was filed with the Bankruptcy Court on June 14, 2001. Please file the original and return a time-stamped copy of the Amended Claim to the undersigned in the enclosed self-addressed stamped envelope. Thank you for your attention to this matter.

Very truly yours,

MILLER JOHNSON

By _____
John T. Piggins

JTP/ch
Enclosures
cc:    Ms. Yvonne Rado
       Adam H. Isenberg, Esq.
       R. Kevin Thieme, Esq.

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

IN RE:                                 Case No. 00-3840 (JKF)

FALCON FOAM CORPORATION.                Chapter 11; Filed: 10/05/00

              Debtor.
_____/

### AMENDED NOTICE OF APPEARANCE

NOW COMES John T. Piggins, formerly with Tolley VandenBosch Korolewicz

& Brengle, P.C., and Amends his May 22, 2001, Notice of Appearance to change his firm and

address as reflected below, regarding his representation of creditor, Yvonne Cox:

                         Respectfully submitted,

                         MILLER, JOHNSON, SNELL & CUMMISKEY, P.L.C.

Dated: November 6 , 2003        By:
                                   John T. Piggins (P34495)
                                   Business Address:
                                   P.O. Box 306
                                   Grand Rapids, MI 49501-0306
                                   (616) 831-1700

# MILLER, JOHNSON, SNELL & CUMMISKEY, P.L.C.

## Attorneys and Counselors

JOHN T. PIGGINS
ATTORNEY AT LAW
616.831.1793
616.988.1793 fax
pigginsj@mjsc.com
www.millerjohnson.com

CALDER PLAZA BUILDING
250 MONROE AVENUE NW, SUITE 800
P.O. BOX 306
GRAND RAPIDS, MICHIGAN 49501-0306
616.831.1700

ⁱⁱⁱ MERITAS LAW FIRMS WORLDWIDE

November 6, 2003

David D. Bird, Clerk
United States Bankruptcy Court
District of Delaware
824 Market Street, 5th Floor
Wilmington, DE 19801

       Re:   Falcon Foam Corporation
              Case No. 00-3840 (JKF)

Dear Mr. Bird:

      With respect to the above-referenced case, enclosed herewith for filing please find our Amended Notice of Appearance.

      Please amend the matrix in this matter to include the firm of Miller, Johnson, Snell & Cummiskey, P.L.C. in place of Tolley VandenBosch Korolewicz & Brengle, P.C.

      Very truly yours,

      MILLER, JOHNSON, SNELL & CUMMISKEY, P.L.C.

      By               John T. Piggins

JTP/ch
Enclosures

CLAIM
2853
For ADDRESS UPDATE
11/18/03

## CERTIFICATE OF SERVICE

       I, William A. Hazeltine, do hereby certify I am not less than 18 years of age and that on this 18th day of January, 2008, I caused a copy of the foregoing *Memorandum of Points and Authorities in Support of Motion of Defendant Yvonne Cox for Transfer of Venue to the United States District Court for the Western District of Michigan* to be served upon the parties listed below in the manner indicated

**HAND DELIVERY**
Norman L. Pernick, Esq.
J. Kate Stickles, Esq.
Kathleen P. Makowski, Esq.
Saul Ewing LLP
222 Delaware Avenue
P.O. Box 1266
Wilmington, DE  19899-1266
Fax: (302) 421-6813


       Under penalty of perjury, I declare that the foregoing is true and correct.


*January 18, 2008*           */s/ William A. Hazeltine*
Date                      William A. Hazeltine